Case number 23-5244. Gary Sebastian Brown, III, Appellant v. Federal Bureau of Investigation. Mr. Wesneski, I make this carry-on for the Appellant. Mr. Brown for the Appellant. Ms. Smith for the Appellant. Good morning. Good morning. Whenever you're ready. Thank you, Your Honor. Good morning and may it please the Court. I've asked to reserve one minute for rebuttal. This appeal raises two familiar and persistent issues with the agency's FOIA responses. First, the agency narrowly construed Mr. Brown's request to exclude documents responsive to his request, namely by redefining accounts, narratives, and statements to mean simply interviews. Second, the agency failed to separately and specifically identify the harm that it reasonably foresees would result from the disclosure of the information withheld, particularly with respect to Exemption 70. FOIA is a way, sometimes the only way, for citizens to understand what their government actually is doing. The presumption under multiple statutory amendments is always in favor of transparency and disclosure. District Courts errors in carrying out that statutory mandate require reversal and remand. I'd like to turn to the first issue of scope, and before I discuss some of the more textual discussions that the parties have had, I want to just frame a little bit what the standard is here, because it's not an exercise in statutory interpretation. This Court's precedents have repeatedly said that FOIA requests are to be construed liberally, and in Lysedra, this Court indicated that if a FOIA request is reasonably susceptible to two interpretations, one broader and one narrower, then the agency and the Court should adopt the broader reading. I think once you put that in context here, there actually shouldn't be much debate that the FBI erred in construing Mr. Brown's request narrowly. Put simply, Mr. Brown asked for three things, accounts, narratives, and statements, and the FBI gave him something different, a fourth thing, interviews. Now, there has been some discussion. He asked for those things provided by witnesses, so it's not just, you know, there have to be things that are provided by a witness. Yes, Your Honor, I agree, and I do think even in implicit in accounts, narratives, and statements, even if it wasn't qualified by saying these are from witnesses, those terms, I would agree, indicate that the information is coming from a witness, but the FBI, again, to the extent there's any ambiguity about is there a difference between interviews on one hand and account statements and narratives on the other hand, I think any ambiguity there is a consequence of the FBI choosing in the Seidel Declaration and in its scoping step to use the criteria of interview instead of account, narrative, and statement, which is what he asked for. The FBI has, we've suggested or asked if there are any documents that are excluded from that search that they think would be in account statements or narratives, but aren't in interview. We don't know the answer to that, and the FBI hasn't told us. What we do know, though, is that the search as they described it is not for account statements or narratives, but instead for witness interviews, and the question, importantly, is not whether there are any such documents because, of course, Mr. Brown can't know the answer to that. The question is the threshold issue of did the FBI correctly interpret and apply the scoping determination of the FOIA request consistent with this court's precedent, and respectfully, whatever arguments or discussions the parties may have about the sort of semantic distinctions between those two or three things, I think it is clear that the FBI at least has represented in the more narrowly than accounts, narratives, or statements. Counsel, when Mr. Brown received the first 19 documents and responded that that was not adequately responsive to his request, in that letter, I believe, I don't have it in front of me, but you'll know where it is, in that letter, I believe he again referred to interviews. He may have revert. I have to look at that particular letter. I know that the original FOIA request, Your Honor, does not use the term interviews anywhere in it at any point. It does stay as Judge Rauh correctly pointed out. It does say witness accounts, statements, and narratives, and then it goes on and says again later. Well, perhaps before you come back for your reply, you could locate that and we can talk. I will, yes, Your Honor. Mr. Wisniewski, it doesn't say witness accounts, narratives, or statements. It says accounts, narratives, or statements provided by a witness. So that seems to suggest not something like a 911 call that was just, you know, that happened to be recorded. It has to be provided by a witness. I think that the words provided by do some real work, or at least it was reasonable for the FBI to construe that as something formally provided by a witness, like an interview. Yes, Your Honor, and just to clarify the FOIA request, I certainly agree obviously with your recitation. It says witness accounts, narratives, or statements provided by witnesses. So it's on both sides there. So I take the point though, which is that I think what Your Honor is saying, I think correctly, is that there's a reasonable interpretation that this is going to be information that comes from a witness, not information that comes from some other source. And so in that respect, I think it could be reasonable for the FBI to exclude some things that are not sourced from witnesses. So, you know, if it's security footage of the incident, I don't think that's responsive. But what we don't know is included is things like written witness statements, which I don't believe would be included in the definition of interview, but I don't know. Maybe the FBI can tell us. Summaries by FBI interviewers or local agencies, officials of a compilation of interviews. You know, we interviewed 10 people, and here's what we learned from those 10 people. Something like that that would summarize the information. And again, we don't know if there's other things that were excluded, because all we know is that the FBI narrowed it to interviews and searched for FD 302s. That's the that's the totality of the information we have about the scoping. Do we know that the CRS search sentinel search turned up more documents than were turned over in any part? I think that is certainly implied by Mr. Seidel's declaration where he says that the undertake the CRS search, and then there is a second scoping step where a analyst actually has to review the responsive documents. Then he says, and in that step, the responsive documents were narrowed to enter. So that's key. All right. At 262 in the J. I believe this page was turned over to that's right. This has to do with the San Bernardino Police Department. Interview a witness. Yes, your honor. So near the bottom of that for the sign off, we see enclosures. Correct? Yes. And they're crossed out. How do you understand that? Do you understand that to mean? I don't know what this means. I see that there is a you and then two slashes and then it looks like E. O. U. O. and only the E. O. U. O. is crossed out. So I don't know if that means that there is no such audio CD interview or that there is an audio CD interview. That wasn't from the FBI. I just wanted to know if you had an interpretation. I don't have an interpretation. And again, the challenge for Mr. Brown and all FOIA requesters is that the information we have is limited to what the FBI provides us in terms of what was what was turned up. So, again, it may may very well be the case that there is nothing else responsive to his FOIA request other than what they provided. But if that's true, the FBI needs to tell us as much in a declaration represent. Yes, we looked for interviews, but had we looked more broadly for account statements or narratives, we would have provided the same documents. Standard of review question. Imagine that the record before the district court and the hypothetical I'm about to describe is exactly the same as the record before the district court in our case. But instead of the district court writing an opinion, the district court just says summary judgment granted to the government for not a summary judgment granted the government period. Our review there, I think, would be de novo based on the record before the district court. And even though the district court didn't say anything other than summary judgment granted to government, if on our de novo review, we think the record supports summary judgment, we would affirm the district court's one sentence opinion. Is that correct? I think that's accurate, Your Honor. And I think perhaps what Your Honor is asking about is the seeable harm issue, which is, you know, the statutory. And I think this court's precedent says that the district court has an obligation to explain. Certainly, the agency has an obligation to substantiate its conclusion about foreseeable harm. And here, it's very apparent that the district court didn't do that. I think this court certainly has the discretion to evaluate the record for itself and make a determination as to whether the evidence put in in support of the motion for summary judgment supports the foreseeable harm determination or supports that there was a foreseeable harm analysis and that it was under the statute. I think it would be at least for I think it would be more prudent, frankly, to allow the district court to undertake that examination in the first instance with a more fulsome declaration that we've described that addresses it more directly. But I certainly think this court would be well within its power to undertake that analysis itself. Can I ask you also about the foreseeable harm standard? So, Assumption 7D seems to have two parts, right? It's records that could be reasonably expected to disclose the identity of a confidential source. And then it has, you know, it has one prong and then it says in the case of a record or information compiled by for law enforcement, information furnished by a confidential source. And so, unlike many of the other FOIA exemptions, that part of 7D seems to have almost a categorical exemption. So, you know, if there's a confidential source that furnished information in the course of a law enforcement investigation, that's exempted from FOIA. So, I guess since Congress seems to have made that determination, what does the agency have to offer that's more than a generic rationale? I mean, because many of the exemptions are written in a way where there's a particular interest, you know, like 7s, you know, that like FOIA exemption 6, medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. So, there's something that has to be shown there. There's harm to personal privacy. But the second part of Exemption 7D doesn't seem to really have anything. Your Honor, I think the categorical nature of Exemption 7D actually is part of what makes the foreseeable harm requirement more important, more rigorous in this case. And some district courts have talked about this, which is that there are some exemptions, like the one Your Honor just identified, that seem to have some element of foreseeable harm sort of baked into the exemption. And if that's the case, and if the agency justifies the application of the exemption, it's not clear that the agency needs to do a lot more to justify the withholding of that information as giving rise to foreseeable harm. But with Exemption 7D, at least with the second clause of Exemption 7D, as Your Honor said, it's categorical. I mean, the FBI could have conceivably withheld every document that it produced to Mr. Brown. It could have withheld on the basis of 7D because, according to the agency, it's all confidential. It's all information provided under an assurance of confidentiality. But the reason Congress in the 2016 FOIA Improvement Act added the foreseeable harm standards is because it recognized, in the context of the amendment, it was particularly with respect to the deliberative process privilege. But I think it applies equally to Exemption 7D, which is that when you have these very categorical exemptions, which have rational policy justifications for them, that they can easily be overapplied to large categories of information that really should be disclosed and really don't pose any risk of harm. So I think what is missing here is, I think Exemption 7D, as I read it, the concern, and it's a legitimate one particularly here, is that if you disclose information that leads to the identification of a confidential witness, that that information could lead to foreseeable harm or some sort of harm for that particular witness. And that's why Section 7D, the first clause, I think actually has a pretty, has sort of a foreseeable harm standard built into it here. We don't take issue with the FBI's conclusion here that if information were released that led to the identification of these witnesses, that that information could pose a risk of foreseeable harm. But what's missing here is an explanation and a justification for how the information that has been withheld would in fact lead to the identification of these witnesses. But the second part of Exemption 7D doesn't seem to focus on the identification of witnesses. It's, as we were discussing, it's categorical. So do you have to have both parts of 7D in order to have a withholding under 7D? No, Your Honor. You don't, not for Exemption 7D, but however the agency is going to justify the finding of foreseeable harm, right? What the FBI said here, the FBI's justification here for withholding these documents under 7D was the identification issue. Now you can imagine there. Maybe they didn't really need a justification at all because the second part of 7D is so categorical. I think if that were the case, then I think this court has said and the Reporters Committee for Freedom of the Press and Leopold that there has to be some independent examination separate from the exemption itself. So the fact that Exemption 7D is categorical and broad doesn't lessen the burden on the agency to evaluate and justify the withholding on foreseeable harm grounds. Again, I would argue that based on what we know about what Congress was trying to do with the 2016 amendment, that it actually makes that more important and in some ways perhaps a more rigorous standard that the agency needs to make. We have this large amount of information that could conceivably be withheld, but as a matter of congressional policy, we don't want to hold back everything just because it falls within an exemption. We want to actually have an evaluation of whether disclosure of this information is going to harm an interest. And this is a categorical exemption and we think here if you look at it, there really was not in the Seidel Declaration and in the redactions themselves a discernible justification for why certain information about the attack particularly was withheld, but then all sorts of other information before the attack and after the attack was not withheld. And we don't have that explanation. So part of your argument to this effect, I believe, is your third itemized item on the list, page 39, where you say the FBI has claimed if it's required to release information provided by CWs, persons, quote, sympathetic to the suspects could seek to deter sources cooperation with law enforcement through reprisal. You say this reasoning is not sufficient because, quote, the foreseeability requirement means that agencies must concretely explain how disclosure would, not could, deter a source's cooperation with law enforcement. Yes, your honor. Your reference, your quotation is from Reporters Committee. What it actually says is, in the Reporters Committee case, in the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agency must concretely explain how disclosures would, not could, etc. That's pretty clearly inapplicable, isn't it, to 7D, specific to Exemption 5. I disagree, your honor. Respectfully, the statutory foreseeable harm requirement is not different for deliberative process versus Exemption 7D versus any other exemption except for Exemption 3. So you think they have to be in the same way? I think it has to be, yes. I mean, what the court there is quoting, the statute, right, would, is what the statute says, and it's distinguishing that from could. That statutory language about would result in foreseeable harm is in the generally applicable foreseeable harm standard, not in the deliberative process. So when we go to confidential witnesses and this question about generic harm, I'm still grasping for your argument to understand your argument with respect to how much more can be said than this is a confidential witness, etc. The harm in question is obviously not that it would be disclosed, but that if it was disclosed, it could be disclosed, it could have this effect. How can one say it would? Well, I think, again, the missing link that we see here, your honor, is the link between the information that they chose to withhold and an ability to identify these actual witnesses. So what I would say is, under the statutory language, what the FBI needs to explain is how somebody who had access to that information would actually have the ability to discern the identity of the witnesses who are providing this information. Not merely that there is a hypothetical possibility out in the world that if somebody puts together, you know, all the information, they go out and Google it, and then they have a whole investigation, that maybe it's possible, we don't actually know how, but we're just entertaining the possibility that someone could discern the identity. There needs to be something about how there's an actual connection. Having the ability is just as contingent as could. I think, your honor, that the distinction here is sort of an abstract hypothetical versus something more specific and concrete to the information here. And the problem we have here is, your honor, that the Seidel Declaration says that, well, witnesses have unique perspectives on a particular matter. That is a high level of generality that I don't think is consistent with what this court has said is required in the receivable harm requirement. And I think there has to be some level of specificity about how this information here, about this particular incident, would actually lead to an identification of witnesses if someone were so inclined. I would have thought that, in the context of confidential informants, there's maybe always receivable harm, because there's harm to the FBI's ability to convince future informants to cooperate. And if on day one, they start revealing informants' confidentiality, or to use some of the language in this case, they provide the missing link, singular evidence that would allow someone to reverse engineer the witness's identity in this case. Let's say that in this case, revealing the witness's identity actually doesn't hurt that witness for whatever reason. Maybe the witness has passed away. It still is going to always or almost always cause harm to the FBI's ability to convince future witnesses to cooperate. So a couple of things, Your Honor. First off, again, I don't think we have a disagreement, at least in this case, that information that actually leads to the identification of the witnesses would lead to foreseeable harm and should be withheld. Foreseeable harm to those witnesses. To those witnesses. That's not what I'm talking about. I'm talking about foreseeable harm to the FBI and its ability to convince future witnesses to cooperate in a confidential manner. Yeah, I don't think we disagree with that either, to be clear. And that means there's foreseeable harm? No, Your Honor. I think what the distinction here is, the information that's being withheld is not information that, at least as we understand it and based on context, is not information that actually identifies the name of the witness or defining features of the witness. What the FBI has withheld is information about any account, at all, any account from any perspective of the actual attack. If you look at the exemption, if you look at the documents that were produced here, there is a significant amount of disclosed information in the events leading up to the attack and a significant amount of information, of disclosed information immediately after the attack. Everything during the attack itself is redacted. There is no information from any witness from any perspective. So the problem isn't that the FBI is protecting the identities of these witnesses for whatever purpose, for their protection, for the protection of the FBI. We have no objection to that. The problem is that they've redacted all this information that, as far as their explanation goes and as far as we can discern from the information we have, doesn't actually allow for identification of these witnesses. As we point out, someone says there's a red hat, that doesn't mean that we now know who the witness was. Fair enough. I guess my question is a little broader. I think you've probably already answered it, but I'll give you a chance to answer differently if I misunderstood you. It's a question more in the abstract, and that is, if 7D is satisfied, it seems like the foreseeable harm requirement is always or almost always going to be satisfied. Because once you do what 7D, once the FBI reveals what 7D requires to be withheld, the FBI is chilling future confidential informants from becoming confidential. I would agree with that, your honor, as to the first clause of 7D, which is the actual identifying information of the witnesses. I would not agree that any time that there is, that the FBI withholds information from a confidential witness, meaning the actual substance of the information that was provided, that there is now necessarily foreseeable harm. And that's because you think the information here would not allow someone to reverse engineer the witness's identity. I don't believe it would, but again, I don't know for sure because the Seidel Declaration and the information we have certainly doesn't provide that link for us. It could be wrong, but we'll need that explanation from the FBI. I appreciate your answer. Any further questions? Thank you. We'll give you some time on rebuttal. Mr. Brown, we'll hear from you next. Hi. Good morning, your honors, and may it please the court. I'd like to address some of the concerns that I heard, one of which is the categorical nature of exemption 7D. So on page 53 of my opening brief, I actually did quote a Supreme Court case, Department of Justice v. Londano, and I haven't found any countervailing case law. But what it says is that exemption 7D does not support the presumption that all FBI criminal investigative sources are exempt, nor does the FOIA's legislative history indicate that Congress intended to create such a rule. And of course, the FBI's rationale by saying that these were confidential sources was the fact that they were participating in a criminal investigation. Secondly, I wanted to address the issue of medium. A statement provided by a witness can be provided through any medium. So whether they get on the phone and make a 911 call and it's recorded by the call service center, it's still a statement provided by the witness. If a law enforcement officer is witnessing something, reports it over the radio, and it gets recorded on a CAD log, that's also a statement provided by a witness via the radio and recorded in a CAD log. So I don't think that there needs to be some sort of requirement. The witness is the medium themselves that they're handing it or they're saying it directly. I mean, I think those things are direct, but I wanted to bring up those issues. Thank you, and I welcome any questions. Yeah. Did you want to say anything more about the categorical nature of 7D and what might be required there? I know you mentioned that you cited a case in your brief. Which page of your brief was that? That was page 53, Your Honor, Department of Justice v. Londano in the opening brief. I guess I'm not seeing that on page 53, Mr. Brown. Can you be more specific about where on page 53? Oh, I'm sorry. I apologize. It's page 39. It's 53 of the header. Yeah, I apologize. Okay, I see it now. I appreciate that clarification. It says, particularly where, after Weisberg, the Supreme Court explained that Exemption 7D does not preserve the presumption that all FBI criminal investigative sources are exempt, nor does the FOIA's legislative history indicate that Congress intended to create such a rule. Is that the one you're referring to, Mr. Brown? Yes, Your Honor, and if you look at Chief Siegel's logic in his declaration, he's saying that this is just a mere fact that they're participating in a criminal investigation, therefore they're confidential as a per se rule. Mr. Brown, have you, subsequent to this litigation or to the response of the FBI, filed a different FOIA request seeking, you know, that might be more specific in terms of which records you were seeking? No, I have not, Your Honor. Any other questions? No? Okay. Thank you, Mr. Brown. Thank you. May it please the Court, Sarah Smith, on behalf of the government. I'd like to return to the issue of foreseeable harm. As the FBI's declaration makes clear, the FBI performed the distinct consecutive inquiries required by FOIA. The FBI first analyzed whether the records at issue satisfied a specific FOIA requirement. The FBI then analyzed whether the records at issue  a FOIA exemption, and then the FBI analyzed whether release of those records, in whole or in part, would foreseeably cause types of harm that those exemptions were designed to prevent. With regard specifically to Exemption 7D, the FBI withheld the identifying information of its confidential sources, as well as singular information provided by those witnesses that could identify them, and the FBI explained that release of that information, which could particular witnesses who cooperated with this investigation, and then, as Judge Walker was discussing with my colleague, harms to the FBI's ability to get other future witnesses to cooperate. So the FBI identified the specific nature of the harm from release, and it articulated the link between those harms and the specific information in these records, and the law requires nothing else. What's your best argument, that the information could be used to identify the witnesses? So, as the CITL declaration makes clear, the information was helped with identifying information, like names and so on, and I don't take there to be any issue with that. As for, but the declaration also talks about the fact that this shooting occurred at a workplace, that the witnesses knew each other, that they worked with one of the suspects, and that the witnesses provided information that was based in part on what they did during the attack, how they responded, and because the witnesses knew each other, they knew the suspect, those accounts, if revealed, could identify, someone could identify, oh, you know, this is Bob's account, because it says, during the attack, I ran into the closet with Harry and Susie. That's the sort of thing. So, is it the government's position that it's required for the second part of 7D to do this sequential foreseeable harm inquiry? Because the way that that part of 7D is written is very categorical, and the foreseeable harm here that's articulated is linked to arguably a different exemption, right, which is revealing the identity of a confidential source. So, so I'm wondering if it's even required for the government to make this sequential determination for an exemption like 7D. We have not argued that the FOIA Improvement Act doesn't apply to 7D or part of 7D. The Exemption 3 is the only exemption that's expressly exempted from that requirement. So, we haven't argued that it doesn't apply. I take the point that the government doesn't argue that, but could we read the statute that way? I wouldn't want to say that the government couldn't make that argument in a different case. I just don't think it needs to make that argument here, because it's clear from the declaration that the FBI did consider foreseeable harm. And, you know, I agree with the court that that second part of 7D is very broad, but I think that it's still probably true that the purpose, the Congress's purpose in protecting that information was to protect information that could identify sources and to ensure that sources continue to cooperate with the FBI, and those were the harms that the declaration here discussed. If we could return to this page 262 in the JA, the FBI secret, well, that's crossed out, import form, and the title, San Bernardino Police Department Interview of Witness. So, under enclosures near the bottom, it says, enclosed are the following items, SBPD, original report, and audio CD of interview of blank. So, I take it that those two enclosures, is it correct, turned up in the initial search of the CRS by the Sentinel program? I'm not sure whether the audio recording that Your Honor mentioned showed up in the reporter, if it's in the FBI's possession. It seems that at some point it was, but even accepting, or even if we assume that the FBI did have those audio recordings of the interview, that would not identify a problem with the way the FBI interpreted plaintiff's request. Audio recordings of an interview are interviews. That instead would identify a problem that the FBI didn't turn over all the responsive documents in its possession. And this court has said many times that a search is not inadequate just because it doesn't turn over every record that's responsive to the request. So, I gather that the process was that the CRS turned up more than the 411 documents, because according to the declaration, as Ms. Jaworsnowski reminded us, the agency reviewed what turned up and excluded some things from disclosure. What was the search term that caused them to appear? So, they searched the CRS for Inland Regional Center. That's the place where this massacre occurred. So, it was everything regarding this incident. That's correct. And if those were not turned over, it could have been for any reason. Whatever was not turned over. We don't know why. Right. We don't know if they were in the government's possession. We don't know whether they got filtered out. Oh, I see. Even if it turned up in the CRS, they might not be in the government's possession. No. If they turned up in the CRS, then the CRS is the FBI's database. So, if they showed up in the CRS, they would be there. Document 412 is withheld in its entirety through the sifting process of search results. We know the reasons given for various redactions on the first 411 pages. We don't know anything about why 412 was withheld. Right. So, there's, well, there's no evidence that the agency, if 412 is this audio recording that... Well, we don't know what it... Right. Some things were not released, even though they turned up in the search results. So, the agency searched Inland Regional Center, which brought up all the records relating to this event, and then narrowed those results to interviews, because it interpreted probably plaintiff's request for witness accounts, narratives, and statements as a request for, you know, their descriptions of what happened that day, and the agency reasonably determined that that information would be found in the interviews taken of those witnesses. So, that's what the FBI... So, it would have been enough that it wasn't in an interview? I'm not sure I'm following the question. The reason for not releasing a document that turns up in the search could be the sole reason that it wasn't in an interview, and the request was interpreted as limited to the product of interviews. It could be. It could be. That is correct. Yeah. And when... I correct that after releasing the 411 documents, you heard again from Mr. Brown that he was not satisfied? No. So, the FBI first produced 19 pages of previously released documents and told Mr. Brown, if you're not happy with this, let us know. We'll search again. And he said he was not happy. The FBI searched again, and then this is the second production, is the 416. So, that led to filing the case rather than to any further pursuit of the documents. Okay. Thank you. If there are no further questions, we ask the Court to affirm. Thank you. If I may make just two very brief points. First, with respect to the issue of harm, what my colleague indicated was that there's singular information that was withheld, which we talked about as sort of the broad, generic explanation that we see a lot from the FBI. But I think it's important to test that a little bit. Let me just direct the Court to, as an example, JA-220. And this is consistent. These redactions are consistent with how the FBI approached the other FD-302s. You'll see on JA-220 that there's a significant amount of unredacted information. That unredacted information includes the fact that this person was employed by the Department of Public Health, the time that they arrived at the facility, the specific place where they parked, or general area where they parked, the place that they left and went later on to, the time that they arrived at the place, the time that they, you know, broke for lunch, got in the back of the line to take pictures, where in fact that they, you know, what wall they were facing at the time that they did that. Now, if the FBI's position is that that information that they've chosen to disclose does not pose a risk of foreseeable harm to this witness, it's unclear why that same level of information, or I would argue even less singular information about the attack itself, would pose such a risk of foreseeable harm. Again, we're not contesting that there might be portions of the withheld materials that are legitimately redacted because they would, in fact, lead to the identification of the witness. On this page 220, what unredacted information do you think is unique to this unnamed person? I don't know that it's unique to this person specifically, but it certainly narrows it down, right? We have information about the time that they specifically arrived. Right, but maybe the FBI redacted information unique to this person and did not redact information that would allow the reader to narrow it down, in your words, but it's information that's not unique enough to identify the person. I think if that's the FBI's approach, we wouldn't dispute it, but I don't think that that's really articulated in the Seidel Declaration. I don't think if you look at this example, that this particular example, that it suggests that that is what happened, because again, what we have is we have a bunch of unredacted material, then we have a huge block of redacted material. Everything that takes place during the attack itself, if you turn over to page 221, you'll see there's more blocks of redacted information, and then it picks up. I thought, it could be misremembering, but I thought that the Declaration described redacted information as singular information that provide a missing link, allowing a reader to reverse engineer the information in order to identify the person. I don't know that it went so far as to say it could be reversed engineer, but it certainly said it. That's my word, but singular was there. Singular is in there. As we've pointed out, though, that is... What information do you... They say that the singular information was redacted. What information on page 220 is both unredacted and singular? I think the answer is none. I don't think that necessarily any of it is. The problem that we have with this, I think what this example shows, is that it's not clear at all that the FBI actually did that. That's what they said they did, though. Why doesn't this show that the FBI made a good faith effort to give as much unredacted material as it could, and the things then that they redacted may have been more singular or raising more concerns about harm to the confidential witnesses? Maybe this example actually points the other direction, that they made a good faith attempt to provide everything they could. I think it would be remarkable, Your Honor, if every single witness interview, all of the information, every line of it about the actual attack itself, was identifying singular information for every single witness, which is the FBI's approach here. Every other interview memo has this same pattern. Every line, every single comma about the attack itself. It sounds like they were consistent. Consistent, but not, I don't think, consistent in a way that is reflected in the Seidel Declaration, or at least the approach that's described in the Seidel. I could be misreading now on page 221, could be misreading this, but I understood you to just say that they redacted every piece of about the attack itself. But here, it's unredacted where it says, I asked him, being the witness, if there was anything else distinctive about the SUV parked outside the doors. I'm guessing, I don't have any access to confidential information, so I can't reveal any confidential information. I'm guessing that that SUV connected to the crime itself, and I just asked about a random SUV. He said the vehicle appeared stock to him. It was shiny, new, with no tinted front windows. He did not see the license plate, but he knew it was not one of his colleague's cars. There's a whole paragraph about the attack itself, and you just said there's nothing in there about the attack. I don't think, Your Honor, that's about after the attack. This is an SUV that was seen driving away from the scene. This is not, okay, so this is not the suspect's SUV already? I mean, I think it is likely. I don't know. Obviously, we don't know. This saw exactly what they saw, but I do think it is likely the suspect's SUV, but the point is- That seems pretty connected to the attack itself, the attackers. Well, I mean, maybe I was imprecise, but I'm talking about the attack itself in the room, right? What Mr. Brown wanted, which is, what do these people look like? How many of them were there? What were they wearing? What did they look like? What's their bill? All of that information was what he actually wants. He doesn't want to know what kind of car they drove. I think that, I mean, the information about the SUV being parked outside the doors is very public and well-known, so I'm sure he's happy to have that information. Fair enough. I really did not mean to, well, I wasn't doing gotcha for the sake of doing gotcha. I understand. To push your theory and see if your theory is that they were just willy-nilly taking out everything that has to do with the attack, and there's stuff in there that has to do with the seems like they have a principle, it's a reasonable principle, and they're applying it in a consistent way. I think the way that, Your Honor, specifically I'm seeing how they applied the principle is that they, I don't know if there's a determination or an assumption or what the process was, but they decided at some point that everything for every witness about the actual, the attack in the room was going to have a perceivable harm. And that, if that's true, maybe that is true. But if that's their process, if that's their theory, if their conclusion is, you know, we looked at the information before, during, and after, and the information before and after is qualitatively different from the information during the attack. And it's qualitatively different for these three reasons. Put that in a declaration, then we can read it, we can evaluate it, and we can determine if it satisfies the statute. But what they said was, we redacted singular information. Fair enough. And not blaming you for making these arguments, especially because we appointed you to these arguments. So we are benefited by making the best arguments that can be made. I appreciate that, Your Honor. If the court has no further questions. Well, I just want to stay right with this at page 221, pardon me, which is the back side of the report, the interview report at 220, second page. Yes, Your Honor. Apparently, this witness was not in the building. Correct. Talks about the SUV parked outside. No, that's not correct. This is earlier on. It says he attended the meeting, talked to Minko with coworkers. That's right, Your Honor. They were breaking for lunch. Okay. I think this is discussing, and this is sort of a point maybe I was sort of inartfully making, which is that this is. The next page, next interview report, 223, the back side of the next page. Um, she said she was not in her office at the time of the shooting. She had just arrived at work and was in the east parking lot. Does that by itself take her out of the requested request for information? I don't know, because we don't know what else is is redacted here. So I thought you wanted the information from people who were in the room from witnesses who have information about the description, number, identity of the shooters. What we what we see here is, uh, she was present at the Inland Regional Center. She was not in her office at the time of the shooting. She was in the parking lot. She said that she had just arrived at work and was in the east parking lot east of building number two. We don't know beyond that what she saw. Okay, I'm going to go, let me make sure, well, take me back to the request, you know, the Mr. Brown's request and the letter that follows, follows it. Um, so I'm in here, brain seven. Specifically, I'm seeking accounts, narratives and statements from witnesses who were located in the conference room where the attack mainly took place. Yes, Your Honor. Doesn't that exclude somebody who was in the parking lot when the shooting occurred? I think that would be a reasonable interpretation by the FBI if they wanted to exclude those. But, but, you know, the example, the issues that we have is not with those accounts. Although I, you know, I still don't know what the rationale or the methodology is for redacting the information that was redacted there. But the example that I gave first on JA220, I think, is really more germane to the request and what we see as the issue with the FBI's approach. And was he in the room when this occurred? I'm sorry, it was who? The one at 220. We don't know for sure. Maybe he says that he was in the conference room. They broke for lunch, that he went to the West Fall, West Fall facing east. And then that's the last piece of information we have before he describes the SUV after the attack. We certainly have a number of, a large number of these FD302s that follow a similar pattern, which is that somebody is in the room. There's some description of what they're doing up until that point, what's happening in the room. And then it stops. It's all redacted. And then it picks up either at the same point about the SUV in the parking lot or talking about sort of their relationship with the suspects more generally. Thank you. Thank you. Thank you. Mr. Musanski, you were appointed by the court to serve as amicus in this matter. And the court thanks you for your very thorough and capable assistance. Thank you. Oh, yeah, yeah. Let's take a short break. Your Honor, I think Mr. Brown. Oh, I'm sorry. Yes, I'm sorry. Mr. Brown, yes. Thank you. Thank you, Your Honor. So I just wanted to address a couple issues real quick. This was an exemption 7A case initially. And the 411 documents were actually provided after litigation was started. So the context is a little bit weird. And then I wanted to talk about the consistency of the FBI and their redaction. I do think they were incredibly consistent. They consistently redacted exactly what was requested, which was witness descriptions of the shooters. And all the other extraneous information provided may not be very likely to lead to identification of witnesses. But it's far more likely than if they had just provided what was requested, which was simple witness descriptions of the shooters. And if the FBI happened to provide documents that were outside the scope of the original request, and that doesn't seem relevant anymore, the question now becomes whether they properly redacted the documents that they did produce. And thank you. I appreciate it. And I'll take any questions. Well, you say in your initial request, of particular importance to this request, there are any descriptions of the perpetrators, etc. You're saying effectively, as far as you're concerned, that's all it means? Yes, Your Honor. That's the primary purpose of the request. That is your concern, your only concern. Yes, Your Honor. Thank you. Thank you. Thank you, Mr. Brown. Thank you.
judges: Rao; Walker; Ginsburg